261 F.3d 896 (9th Cir. 2001)
 PATRICK HUGH MORRISON, PLAINTIFF-APPELLANT,
v.
FRANK HALL, DIRECTOR OF THE OREGON DEPARTMENT OF CORRECTIONS; MANFRED MAASS, SUPERINTENDENT OF THE OREGON STATE PENITENTIARY; TAMARA BLAIN, STAFF MEMBER AT THE OREGON STATE PENITENTIARY, DEFENDANTS-APPELLEES.
 No. 98-35468
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 5, 2001
Filed August 17, 2001
 
 Counsel Margaret Z. Johns, Supervising Attorney, University of California, Davis, California (Brief); Peggy Gibson, Certified Law Student, and Irene Feldman, Certified Law Student, University of California, Davis, California (Argued) attorneys for the plaintiff-appellant.
 Kaye E. McDonald, Assistant Attorney General, Salem, Oregon, attorney for the defendants-appellees.
 Appeal from the United States District Court for the District of Oregon Michael R. Hogan, Chief District Judge, Presiding D.C. No. CV 94-06383-MRH
 Before: Harry Pregerson, Warren J. Ferguson, and Michael Daly Hawkins, Circuit Judges.
 
 
 1
 This case requires us to consider the constitutionality of various mail regulations at the Oregon State Penitentiary ("OSP") where the plaintiff, Patrick Hugh Morrison ("Morrison"), is incarcerated. Morrison argues that two sections of the OSP mail regulations unconstitutionally burden his First Amendment rights: (1) Oregon Administrative Rule ("OAR") 291-131-025(6), which prohibits prisoners from receiving bulk rate, third, and fourth class mail; and (2) OAR 291-131-025(1), which states that "[i]ncoming mail will bear a return address on the front of the envelope and must be addressed to the inmate using his/her committed name and [prison identification or] SID number or as he/she can be identified as shown on the records of the Department of Corrections."
 
 
 2
 On a motion by the defendants for summary judgment, the district court found that "the mail regulations challenged by [Morrison] are constitutionally appropriate. " We have jurisdiction pursuant to 28 U.S.C. §§ 1291, and we disagree in part with the district court's conclusion. Specifically, we find that OAR 291-131-025(6), which prohibits inmates from receiving bulk rate, third, and fourth class mail, is unconstitutional as applied to pre-paid, for-profit, subscription publications. We therefore affirm in part and reverse in part.
 
 I. BACKGROUND
 
 3
 In November 1993, Morrison filed this pro se civil rights action pursuant to 42 U.S.C. §§ 1983.[1] Morrison named Frank Hall, the Director of the Oregon Department of Corrections, Manfred Maass, the OSP Superintendent, and Tamara Blain, an OSP staff member, as defendants in this action (collectively referred to as "defendants"). In February 1994, Morrison filed an amended complaint, which sets forth the factual basis for his §§ 1983 claim that the OSP mail regulations unconstitutionally burden his First Amendments rights. Specifically, Morrison's amended complaint alleges the following:
 
 
 4
 In February of 1993, the mailroom at O.S.P. [Oregon State Penitentiary] returned a Montana Outdoors magazine sent to Patrick Morrison (Plaintiff) to the publisher stating that the address is incorrect when [in fact] the address was correct. This action resulted in the magazine not being delivered to Patrick Morrison until the month of September 1993 after Patrick Morrison contacted the publisher.
 
 
 5
 * * * * * *
 
 
 6
 Plaintiff's claims are against the mail procedures, and the rules that have been placed in effect by the Oregon Department of Corrections governing the procedures for the processing and handling of inmate mail.
 
 
 7
 * * * * * *
 
 
 8
 Actions of defendants stated [above] violate plaintiff's Constitutional Rights of the First . . . and Fourteenth Amendments . . . by requiring parties corresponding with inmates to disclose their [full] name and address on the front of the envelope as a return address in order for the inmate addressee to receive the correspondence. If the return address is not displayed on the front of the envelope, the mailroom refuses the letter, and the inmate addressee is not notified that the mail was rejected and no hearing is offered.
 
 
 9
 * * * * * * *
 
 
 10
 Actions of defendants stated [above] violate plaintiff's Constitutional Rights of the First . . . and Fourteenth Amendments . . . by refusing to deliver correspondence to inmate addressee and not notifying the inmate addressee of the refusal of the correspondence, thus denying the inmate addressee the knowledge of the refusal, and a hearing on the reason for the refusal of the correspondence.
 
 
 11
 * * * * * * *
 
 
 12
 Actions of defendants stated [above] violate plaintiff's Constitutional Rights of the First . . . and Fourteenth Amendments . . . by refusal of Bulk-Rate mail and Third Class mail sent to inmates. . . . by not delivering mail to inmates in a reasonable time. . .. [and] by conspiring to isolate inmates from family and friends, as well as, [acquaintances], media, courts, attorneys, government officials and agencies by use of stringent procedures and rules for the processing of mail.
 
 
 13
 The amended complaint prays for monetary, declaratory, and injunctive relief.[2]
 
 
 14
 In April 1995, the district court granted a motion by the defendants for summary judgment, holding that Morrison lacked standing to pursue his claims and that the defendants were entitled to qualified immunity. Morrison appealed pro se, and in an unpublished decision, we affirmed in part and reversed in part. See Morrison v. Hall, 105 F.3d 665 (9th Cir. 1996) (unpublished). Specifically, we affirmed the district court's decision granting summary judgment to the defendants on qualified immunity grounds.[3] However, we reversed the district court's ruling that Morrison did not have standing to pursue his claims for declaratory and injunctive relief.
 
 
 15
 Following remand to the district court, the defendants once again moved for summary judgment on Morrison's claims for declaratory and injunctive relief. The district court granted the defendants' motion and dismissed the action with prejudice on April 3, 1998. Once again, Morrison timely appealed pro se.
 
 
 16
 Upon reviewing Morrison's appeal, we deemed this case appropriate for the appointment of pro bono counsel. Accordingly, pursuant to an order of this court, Morrison was represented on appeal by certified law students through a clinical program run by the University of California, Davis, School of Law. Following the appointment of counsel, additional briefs from both parties were filed with the court.[4]
 
 II. STANDARD OF REVIEW
 
 17
 We review de novo a district court's decision to grant summary judgment. Botosan v. Paul McNally Realty , 216 F.3d 827, 830 (9th Cir. 2000). Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56. Meade v. Cedarapids, Inc., 154 F.3d 1218, 1221 (9th Cir. 1999). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).
 
 III. ANALYSIS
 
 18
 A. Did the District Court Err in Finding the OSP Mail Regulation Prohibiting Bulk Rate, Third, and Fourth Class Mail Constitutional?
 
 
 19
 Morrison first argues that OAR 291-131-025(6) unconstitutionally burdens his First Amendment rights. OAR 291-131-025(6) states that: "Mail shall be required to be sent by first or second class postage. Bulk rate, third and fourth class mail is prohibited." OAR 291-131-025(6) (1993). Morrison asserts that this regulation is unconstitutional because it prevents him from receiving his pre-paid subscription to Montana Outdoors magazine, a for-profit, subscription publication, which is typically mailed bulk rate, third, or fourth class.[5]
 
 
 20
 1. The Four-Part Test Set Forth in Turner v. Safley
 
 
 21
 "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution. " Turner v. Safley, 482 U.S. 78, 84 (1987). "Thus, when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect [prisoners'] constitutional rights." Mauro v. Arpaio, 188 F.3d 1054, 1058 (9th Cir. 1999) (en banc) (internal citation omitted). "Nevertheless, prisoners' constitutional rights are subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." Walker v. Sumner, 917 F.2d 382, 385 (9th Cir. 1990) (internal citations omitted).
 
 
 22
 "In Turner v. Safley, the Supreme Court set forth the standard for evaluating prisoners' constitutional claims." Id. Turner held that "a regulation that impinges upon a prisoner's constitutional rights is valid if the regulation `is reasonably related to legitimate penological interests.' " Frost v. Symington, 197 F.3d 348, 354 (9th Cir. 1999) (quoting Turner, 482 U.S. at 89). To guide courts in evaluating whether a challenged regulation is reasonably related to legitimate penological interests, Turner established the following four-part test:
 
 
 23
 (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.
 
 
 24
 Prison Legal News, 238 F.3d at 1149 (citing Turner, 482 U.S. at 89-90). Although all four Turner factors are relevant to our analysis, the Ninth Circuit has recognized that"[t]he first of these factors constitutes a sine qua non. " Walker, 917 F.2d at 385 (emphasis added).
 
 
 25
 Our court recently relied on the Turner test in an as-applied constitutional challenge to the same OSP regulation prohibiting prisoners from receiving bulk rate, third, and fourth class mail. Prison Legal News, 238 F.3d at 1146-48. In Prison Legal News, inmate subscribers and publishers of the nonprofit newsletter "Prison Legal News" challenged the same OSP mail regulation "as applied to subscription non-profit organization mail." Id. at 1146. The plaintiffs argued that because it was not feasible, economically or otherwise, for prisoners to have publishers send non-profit publications first or second class, OAR 291-131-025(6) effectively deprived inmates of their First Amendment right to receive such publications, and deprived publishers of their First Amendment right to communicate with inmates. Id. at 1148-49.
 
 
 26
 Applying the first Turner factor to the facts of Prison Legal News, we held that "tying the receipt of subscription non-profit newsletters to postal service rate classifications is not rationally related to any legitimate penological interest put forward by the [defendants]." Id. at 1149-50. Based on this finding, and in recognition of the fact that the first Turner factor is the sine qua non, we stated: "Because the [defendants] have failed to show that the ban on standard mail is rationally related to a legitimate penological objective, we do no consider the other Turner factors. Rather, we are required to reverse." Id. at 1151. With this background in mind, we turn now to the merits of the present case.
 
 
 27
 2. Application of the Turner Test to OAR 291-131-025(6)
 
 
 28
 As set forth above, the first Turner factor directs us to consider "whether the regulation is rationally related to a legitimate and neutral governmental objective." Id. at 1149. This, in turn, requires us to: "(1) determine whether the [defendant's] regulation is legitimate and neutral; and (2) assess whether there is a rational relationship between the governmental objective and the regulation." Id.
 
 
 29
 In the present case, Morrison does not challenge the neutrality of OAR 291-131-025(6). Rather, Morrison argues that the regulation is not rationally related to a legitimate governmental objective. In response to this assertion, the defendants argue, and the district court held, that the regulation furthers the following four legitimate governmental interests: (1) preventing the introduction of contraband into the prison system; (2) reducing fire hazards; (3) increasing the efficiency of cell searches; and (4) facilitating the efficient use of prison personnel and prison resources.
 
 
 30
 After the district court decided this case, however, Prison Legal News rejected all four of these arguments as applied to non-profit subscription publications. For example, Prison Legal News rejected the argument that prohibiting non-profit subscription publications from entering prisons prevents the introduction of contraband because the defendants in that case "presented no evidence supporting a rational distinction between the risk of contraband in subscription non-profit organization standard mail and first class or periodicals mail." Prison Legal News, 238 F.3d at 1150. Similarly, in the present case, although the defendants presented evidence that contraband is sometimes included in bulk rate, third, and fourth class mail, the defendants have failed to present any evidence that the risk of contraband in first or second class mail is any lower than the risk of contraband in mail that is sent bulk rate, third, or fourth class.
 
 
 31
 Prison Legal News also rejected the argument that a ban on bulk rate, third, and fourth class mail reduces fire hazards. As we explained in that case, "[i]t is irrational to believe that delivering the small amount of subscription non-profit organizational standard mail that comes into Oregon prisons would significantly contribute to paper accumulation and increased fire hazard, as the total amount of mail prisoners may store in their cells is currently limited by property regulations." Id. (emphasis added); see also Crofton v. Roe, 170 F.3d 957, 960 (9th Cir. 1999) (discussing the prison property regulations which limit the quantity of possessions that prisoners may have in their cells). Although the number of subscription for-profit publications that enter the OSP may be greater than the number of subscription non-profit publications, because the OSP already regulates the quantity of possessions that prisoners may have in their cell, it is similarly "irrational" to prohibit prisoners from receiving subscription for-profit mail on the theory that it reduces fire hazards. Cf. Prison Legal News, 238 F.3d at 1150.
 
 
 32
 Likewise, Prison Legal News held that the same prison property regulation limiting the total amount of property in a cell also defeated the defendants' claim that OAR 291-131-025(6) "increases the efficiency with which random cell inspections can be conducted." Id. The cell inspection argument is based on the assumption that it is easier for prison officials to conduct a cell search if there are fewer materials in the cell. Id. at 1151. In light of the regulation limiting the total amount of property in a cell, however, permitting inmates to receive for-profit, subscription publications could not possibly increase the total volume of cell materials.
 
 
 33
 Finally, Prison Legal News rejected the argument that a prohibition on bulk rate, third, and fourth class mail is legitimate because it facilitates the efficient use of prison resources. Id. As we explained:
 
 
 34
 The [defendants] assert that the ban on standard mail allows mailroom staff to concentrate its efforts on timely processing acceptable mail and thoroughly inspecting such mail for content and contraband. Publisher and Prisoners respond that processing subscription non-profit organization standard mail would not substantially deplete prison resources and would not add significantly to the mailroom staff's workload. We agree. The reality is that all incoming mail must be sorted. The record shows that distinguishing between non-profit organization standard mail and regular/commercial standard mail is not unduly cumbersome, particularly in light of the relatively insignificant amount of incoming non-profit organization standard mail received at the Department's several facilities.
 
 
 35
 Id.Thus, we held that the "efficient use of staff time" argument cannot justify an effective ban on non-profit subscription publications. Id.
 
 
 36
 In this case, the defendants have failed to submit any evidence regarding the quantum of for-profit subscription publications received at the Oregon prisons. The declaration of John Grill, the Deputy Assistant Director of the Oregon Department of Corrections, states that Oregon prisons receive "massive" volumes of bulk rate, third, and fourth class mail, and that prior to the adoption of OAR 291-131-025(6), "approximately [25%] of a mailroom staff person's time was taken each day dealing with this unsolicited and non-privileged junk mail" (emphasis added). Grill's declaration also emphasizes that mailroom staff must spend a significant amount of time scanning the pages of all incoming"catalogues and brochures . . . in a constant effort to keep contraband from entering the institution." Finally, Grill notes that because catalogues and brochures often contain contraband, and inmates are entitled to a hearing every time contraband is confiscated by the mailroom staff, prohibiting bulk rate, third, and fourth class mail has also reduced the number of confiscation hearings by twenty-five percent.
 
 
 37
 Grill's declaration acknowledges, however, that these statistics relate only to "unsolicited and non-privileged junk mail" (emphasis added). There is no evidence in the record regarding the impact that processing pre-paid, for-profit subscription publications would have on prison resources.
 
 
 38
 The defendants have also failed to submit any evidence demonstrating a rational connection between the postage rate at which a publication is sent and the risk of contraband. This is significant because the defendants assert that incoming mail that may contain contraband drains prison resources by requiring the prison to: (1) spend staff time searching the incoming mail to insure that contraband does not enter the prison; and (2) provide prisoners with a hearing each time incoming contraband is confiscated. But there is no evidence that the risk of contraband is greater in the case of subscription, for-profit publications than it is in the case of mail that is sent first or second class. Indeed, the defendants acknowledge that Morrison could receive subscription, for-profit publications such a Sports Illustrated, The New York Times, or Montana Outdoors if the publisher agreed to send the issues by first or second class mail.
 
 
 39
 At oral argument, counsel for the defendants acknowledged that at its core, OAR 291-131-025(6) is a convenient way for the OSP to limit the total quantum of mail that enters the state prison system. As counsel stated at oral argument,"it's a volume consideration." But prohibiting inmates from receiving mail based on the postage rate at which the mail was sent is an arbitrary means of achieving the goal of volume control.
 
 
 40
 For the forgoing reasons, with respect to the first Turner factor, we find that the defendants have failed to demonstrate that the OSP regulation banning incoming mail based on postage rate "is rationally related to a legitimate and neutral governmental objective." We are not persuaded that there is any legally significant distinction between the subscription non-profit publications at issue in Prison Legal News, and the subscription for-profit publications at issue in this case. We therefore find as a matter of law that as applied to pre-paid, for-profit, subscription publications, OAR 291-131-025(6) is not rationally related to a legitimate penological objective.
 
 
 41
 As in Prison Legal News, because "the rational relationship factor is the sine qua non," our finding that the first Turner factor favors Morrison is sufficient to reverse the district court's grant of summary judgment in favor of the defendants on the constitutionality of OAR 291-131-025(6). Prison Legal News, 238 F.3d at 1151 (emphasis added). Even if the first factor were not dispositive, however, the remaining three Turner factors similarly favor Morrison.
 
 
 42
 The second Turner factor requires us to consider "whether there are alternative avenues that remain open to inmates to exercise their rights." Id. at 1149. The defendants assert that "any materials may be received by [an] inmate if sent to him or her by first or second class mail." According to the defendants, this provides an alternative avenue by which inmates may exercise their First Amendment rights. But Prison Legal News rejected this argument, stating "paying a higher rate is not an alternative because the prisoner cannot force a publisher who needs to use, and is entitled to use, the standard rate to take additional costly steps to mail his individual newsletter."[6] Prison Legal News , 238 F.3d at 1149.
 
 
 43
 The defendants also cite the district court's finding that alternative avenues remain available because inmates may still listen to the radio or watch television. We reject this argument. Although radio and television are alternative media by which inmates may receive information about the"outside" world, they should not be considered a substitute for reading newspapers and magazines.[7] Thus, we find that the second Turner factor also favors Morrison.
 
 
 44
 The third Turner factor focuses on "the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources." Prison Legal News, 238 F.3d at 1149. Here, the defendants essentially rehash their arguments regarding the first Turner factor, focusing once again on the impact of the challenged regulation on prison staff time and other prison resources. For the reasons discussed above in the context of the first Turner factor, we find that the third factor also favors Morrison.
 
 
 45
 Finally, the fourth factor requires us to consider"whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials." Id. This factor strongly favors Morrison. The defendants acknowledge that OAR 291-131-025(6) was instituted because "junk mail took 25 percent of the mailroom staff's time to process." However, the Ninth Circuit has recognized that "because `a personal subscription to a particular publication more nearly resembles personal correspondence than a mass mailing,' such subscriptions deserve more attention than bulk mail." Prison Legal News, 238 F.3d at 1151 n.6 (quoting Miniken v. Walter, 978 F. Supp. 1356, 1362 (E.D. Wash. 1997)). By failing to distinguish between true "junk mail" and subscriptions that have been both paid for and solicited by the inmates, OAR 291-131-025(6) is an "exaggerated response" to the defendants' alleged junk mail problem.
 
 
 46
 Moreover, prisons can and have adopted policies permitting prisoners to receive for-profit, commercial publications, while at the same time, prohibiting prisoners from receiving unsolicited junk mail. For example, the California Department of Corrections ("CDC") adopted a regulation that prohibits prisoners from "possessing . . . catalogues, advertisements, brochures, and materials whose primary purpose is to sell a product(s) or service(s) and when taken as a whole, lacks serious literary, artistic, political, educational, or scientific value." 15 Cal. Admin. Code §§ 30006(c)(11). Unlike the Oregon regulation, the CDC regulation is specifically tailored to permit inmates to receive for-profit, subscription publications such as The New York Times, while at the same time prohibiting the receipt of unsolicited junk mail.[8]
 
 
 47
 Furthermore, the existence of the CDC regulation provides evidence of an easy and obvious alternative to OAR 291-131-025(6). The Supreme Court has recognized that, "[w]hile not necessarily controlling, the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction." Procunier v. Martinez, 416 U.S. 396, 414 n.14 (1974), rev'd on other grounds, Thornburgh v. Abbott, 490 U.S. 401 (1989). The Supreme Court has also recognized that "if an inmate claimant can point to an alterative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Thornburgh , 490 U.S. at 418 (emphasis in original); see also Frost, 197 F.3d at 358.
 
 
 48
 In sum, we conclude that all four Turner factors favor Morrison. Accordingly, we find that OAR 291-131-025(6) is unconstitutional as applied to pre-paid, for-profit, subscription publications, and that the district court erred in granting the defendants' motion for summary judgment.
 
 
 49
 B. Did the District Court Err in Finding OAR 291-131-025(1) Constitutional?
 
 
 50
 Morrison also challenges the constitutionality of OAR 291-131-025(1), which states that "[i]ncoming mail will bear a return address on the front of the envelope and must be addressed to the inmate using his/her committed name and [prison identification or] SID number or as he/she can be identified as shown on the records of the Department of Corrections." According to Morrison, this section of the OSP mail regulations is invalid under Turner because: (1) in applying the regulation, Oregon prison officials reject mail that does not include the inmate's committed name and SID number, even if the inmate can be reasonably identified; and (2) the regulation unconstitutionally burdens inmates' First Amendment rights by requiring the OSP to reject mail that does not include the sender's complete name and return address on the front of the envelope. The district court found that OAR 291-131-025(1) passes constitutional muster under the four-part Turner test. We affirm the district court's ruling.
 
 
 51
 Before reaching the merits of Morrison's claims, however, the defendants argue as an initial matter that OAR 291-131-025(1) does not implicate Morrison's First Amendment rights. We disagree. The Supreme Court has repeatedly recognized that restrictions on the delivery of mail burden an inmate's ability to exercise his or her First Amendment rights. See generally Procunier, 416 U.S. 396; Thornburgh , 490 U.S. 78. We therefore find that Morrison raises a valid First Amendment challenge.
 
 
 52
 With respect to the merits of Morrison's claims, Morrison first argues that OAR 291-131-025(1) is invalid under Turner because Oregon prison officials reject mail that does not include the inmate's committed name and SID number, even if the inmate can be reasonably identified. In response to this assertion, the defendants contend that if the intended recipient may be clearly identified, the mail is delivered regardless of whether it satisfies the technical requirements of OAR 291-131-025(1). In support of this assertion, the defendants point to the language of the regulation itself, which states that "[i]ncoming mail . . . must be addressed to the inmate using his/her committed name and SID number or as he/she can be identified as shown on the records of the Department of Corrections." OAR 291-131-025(1) (emphasis added). The defendants also submitted the declaration of Richard Holder, the Emergency Response Manager for all Oregon Department of Corrections institutions, which states that "[m]ail [r]oom staff make an effort to identify the recipient" when staff time permits.
 
 
 53
 There is no evidence in the record supporting Morrison's assertion that OAR 291-131-025(1) is being applied to deny inmates access to their mail even when the intended recipient may be clearly identified. Because there is no evidence supporting Morrison's claim that the rule is applied in this fashion, Morrison has failed to raise a triable issue of fact as to the constitutionality of OAR 291-131-025(1). Accordingly, we need not consider whether such an application of OAR 291-131-025(1) would run afoul of the First Amendment. We therefore affirm the district court's decision granting summary judgment in favor of the defendants on this issue.
 
 
 54
 Morrison's final argument is that OAR 291-131-025(1) is unconstitutional because it requires senders to include their complete name and return address on the front of the envelope. Morrison argues that this requirement precludes senders from listing a post office box as their return address, or from using initials rather than their complete name. Morrison further argues that there are legitimate reasons why an individual corresponding with an inmate may wish to keep his or her identity and whereabouts confidential. In support of this assertion, Morrison submitted the declaration of Lucy Morrison,[9] which states in relevant part:
 
 
 55
 I have been forced to display my full name and address on the outside, front of all correspondence I have sent to him in order for him to receive it. The displaying of my full name and address on the outside of the envelope does cause me extra concern of some unwanted party obtaining information about me.
 
 
 56
 Despite the fact that there may be legitimate reasons for an individual to resist the requirement that they include their complete name and address on all incoming mail, we must analyze the constitutionality of this requirement under the four-part Turner test. With respect to the first Turner factor, the defendants offer two legitimate penological interests supporting this requirement: (1) that the complete name and return address facilitates the return of mail to the sender if necessary, and allows the prison to inform the sender of prison mail requirements; and (2) that the complete name and return address assists the OSP in investigations.
 
 
 57
 This second reason alone provides a sufficient justification for the rule. The defendants submitted sufficient evidence to demonstrate that "[a] return address is an invaluable and necessary tool in gathering intelligence and conducting investigations." As the declaration of Brad Halverson, the Manager of the Drug Investigation Unit, states:
 
 
 58
 The return address is an integral part of the package of information we rely on when conducting investigations: inmate mail, inmate telephone conversations and activity on inmate trust accounts. Our ability to investigate would be drastically affected without it. An influx of controlled substances into [Oregon Department of Corrections] institutions is a likely outcome of not requiring incoming inmate mail to bear a return address. Increased drug usage and trafficking obviously threatens the good order, safety and security of [the] institutions.
 
 
 59
 Because maintaining security is a legitimate penological interest, Procunier, 416 U.S. at 412, we find that the first Turner factor favors the defendants. Furthermore, because the regulation passes muster under the first Turner factor, and first factor is the sine qua non of the Turner test, we need not consider the remaining factors. Prison Legal News, 238 F.3d at 1151.
 
 
 60
 In sum, because the defendants submitted sufficient evidence to demonstrate a rational connection between requiring that all incoming mail include the sender's complete name and address and the goal of facilitating investigations, which in turn enhances prison security, we affirm the district court's grant of summary judgment to the defendants on this issue.
 
 IV. CONCLUSION
 
 61
 For the reasons set forth above, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Each party to bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 Morrison was initially joined in the complaint by a second inmate, Jody Butterfield, who was later dismissed by the district court for reasons unrelated to this appeal.
 
 
 [2]
 The defendants assert that Morrison only raised a facial challenge to OAR 291-131-025(6) before the district court, and that now, for the first time on appeal, Morrison is challenging the regulation as applied. We reject this argument for two reasons. First, the defendants' argument ignores the fact that Morrison was pro se both in the district court and initially on appeal. The Supreme Court has held that pro se pleadings are subject to a lesser standard than pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520 (1972). Thus, to the extent that there is any question about what claims Morrison raised in his complaint and argued to the district court, we afford Morrison "the benefit of any doubt." Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623 (9th Cir. 1988) ("In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."). Second, as quoted supra, Morrison's amended complaint includes allegations sufficient to put the defendants on notice regarding both a facial and as applied challenge to OAR 291-131-025(6).
 
 
 [3]
 We also affirmed the district court's other grounds for dismissing Morrison's damages claims.
 
 
 [4]
 As a preliminary procedural matter, Morrison filed a motion on May 14, 2000, seeking to supplement the record on appeal with evidence that was not before the district court. As a general rule, Federal Rule of Appellate Practice 10(e), which governs requests to modify the record on appeal, does not permit the appellant to "add to or enlarge the record on appeal to include material that was not before the district court." Dorothy W. Nelson, et al., Ninth Circuit Civil Appellate Practice, ¶¶ 4:16 at 4-3 (2001) (citing United States v. Walker, 601 F.2d 1051, 1054-55 (9th Cir. 1979) ("Rule 10(e) cannot be used to add to or enlarge the record on appeal to include material which was not before the district court.")). We therefore deny Morrison's motion.
 
 
 [5]
 Since Morrison filed this lawsuit in 1993, the OSP amended its mail regulations. As a result of these amendments, the OSP regulation at issue here now prohibits all incoming mail except "express mail, first class or periodicals." OAR 291-131-0025(8) (1998).
 Neither party asserts that Morrison's challenge to OAR 291-131-025(6) is moot as a result of these amendments. Moreover, at oral argument, counsel for the defendants stated that although the challenged regulation was indeed amended, it was not changed "in any . . . material way." Finally, we note that even if the amendments to the regulation were material, Morrison's claim would not be moot. See Friends of the Earth v. Laidlaw, 528 U.S. 167, 189 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)) ("It is well settled that `a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' "). We therefore proceed to the merits of Morrison's constitutional challenge to OAR 291-131-025(6).
 
 
 [6]
 Additionally, as Morrison notes, requiring inmates to pay higher postage rates to receive first or second class mail is not a feasible alternative. At the time Morrison filed this case, he had thirty cents in his prison account. His former co-plaintiff had fourteen cents in his prison account. Permitting prisoners to receive publications only at higher postage rates ignores the practical financial realities that many prisoners face.
 
 
 [7]
 Watching television and listening to the radio will do little to improve literacy rates among inmates. According to The Los Angeles Times, the 1992 National Adult Literacy Survey "found that two-thirds of adult prisoners were not able to write a letter explaining a billing error or extract information from the average sports-page story." Richard Lee Colvin, Reading by 9 Young Offenders Learn ABCs the Hard Way: Caged, L.A. Times, Nov. 8, 1998, at A1. The Los Angeles Times also noted the link between higher rates of literacy and lower rates of recidivism. See id. (discussing the fact that "literacy programs reduce recidivism"); see also Willoughby Mariano, Reading Books Behind Bars Reading Programs for State Prison Inmates and Juvenile Hall Wards are Critical to Helping Offenders Develop Literacy and Avoid Return to Crime, Experts Say, L.A. Times, Jan. 30, 2000, at B2 (discussing illiteracy rates among inmates and citing "correlation between reading, writing and inmate rehabilitation").
 
 
 [8]
 We note that a district court within our circuit found California Department of Corrections regulation §§ 3006(c)(11) constitutional under Turner in Alcala v. Calderon, 1997 WL 446234 (N.D. Cal. 1997).
 
 
 [9]
 Lucy Morrison appears to be the plaintiff's mother.